PCT LAW GROUP, PLLC
LISA A. BELL (*Pro Hac Vice* forthcoming)
1155 F Street, N.W., 10th Fl.
Washington, D.C. 20004
Telephone: (202) 798-5775
lbell@pctlg.com

HERSHENSON ROSENBERG-WOHL
A Professional Corporation
DAVID M. ROSENBERG-WOHL (SBN 132924)
315 Montgomery St., 8th Fl.
San Francisco, California 94104
Telephone: (415) 829-4330
david@hrw-law.com

Attorneys for PLAINTIFF,
ERNEST E. JONES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNEST E. JONES,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>GENERAL ELECTRIC COMPANY;<br>BAKER HUGHES, A GENERAL<br>ELECTRIC COMPANY; LORENZO<br>SIMONELLI; MATTHIAS HEILMANN;<br>HARRY ELSINGA; and DOES 1 through<br>20, inclusive,<br><br>　　　　Defendants. | Case No. 4:18-cv-7086<br><br>**COMPLAINT**<br><br>[PAGA ACTION]<br><br>JURY TRIAL DEMANDED |

### I. INTRODUCTION.

1. Plaintiff **ERNEST E. JONES** ("PLAINTIFF"), an American engineer, and an

   experienced sales executive and corporate-level employee and whistleblower, brings this

COMPLAINT - 1

lawsuit against his former employers, **GENERAL ELECTRIC COMPANY** and **BAKER HUGHES, A GENERAL ELECTRIC COMPANY**(the "Corporate Defendants" or the "Company") and **LORENZO SIMONELLI**, **MATTHIAS HEILMANN,** and **HARRY ELSINGA** (the "Individual Defendants"), the individuals who assisted and carried out as senior managers and officers the wrongful and illegal acts described in this Complaint that they knew to be wrongful and illegal at the time.

2. PLAINTIFF was wrongfully terminated from his job as a "Senior Executive Band" employee at BHGE, despite exceeding his sales goals and exceeding his work performance measures, because he acted ethically by challenging and opposing the Company's decision to underpay and/or deny commission payment to sales representatives whom he supervised, in violation of the Company's policies and contracts and the State of California's laws on wages. The termination was wrongful not only under State law but under federal law: PLAINTIFF was fired, in substantial part, on the basis that his race and national origin (African American) differed from that of his Caucasian European-national supervisors (the "Individual Defendants" herein). And because the Individual Defendants knew that the actions they took were illegal, their conduct constitutes a criminal enterprise within the otherwise legitimate Company and renders each of them liable under RICO.

## II.  JURISDICTION, VENUE AND STANDING.

3. This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331(a)(1) and 1367, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), *et seq., as*

COMPLAINT - 2

*amended* ("Title VII") and the Civil Rights Act ("CRA") of 1866, 42 U.S.C. § 1981, *as amended* ("1981") for the purpose of redressing Defendants' conduct in violation of these statutes. This Court also has jurisdiction under RICO, 18 U.S.C. § 1961 *et seq*.

4. This Court has supplemental jurisdiction over the balance of the claims asserted herein under 28 U.S.C. § 1367, including whistleblowing protection, grounded in law of the State of California. (For purposes of diversity jurisdiction under 28 U.S.C. § 1332, the controversy at issue also exceeds the sum or value of $75,000, exclusive of interest and costs, and the matter includes citizens of different states.)

5. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(g) because Defendant BHGE was located in San Ramon, California. Plaintiff was hired at the San Ramon location and worked out of that same location, which is also where Defendant HEILMANN held an office and upon information and belief the other Individual Defendants regularly conducted meetings.

6. Given this lawsuit arose in Contra Costa County, the case should be assigned to the Oakland Division of this Court.

7. PLAINTIFF has standing to bring this suit as he has timely filed administrative charges before the EEOC and the Florida Commission on Human Rights and Opportunities, and most recently before California's DFEH. PLAINTIFF currently resides in the State of Florida and has received the right to bring this action in court.

### III. THE PARTIES

8. PLAINTIFF, Ernest E. Jones, former Senior Vice President and Chief Sales Officer at GENERAL ELECTRIC COMPANY ("GE") and BAKER HUGHES, A GENERAL

COMPLAINT - 3

ELECTRIC COMPANY, was recruited, interviewed and hired at GE's San Ramon campus to work out of its Oil & Gas Digital Services Division. Mr. Jones was hired in November 2016 as GE's Chief Global Sales Manager. He traveled extensively but his office hub, his supervisor Defendant HEILMANN's office and other key Oil & Gas administrative and operational staff were all located at the San Ramon campus. Mr. Jones is an African American male born in the United States of America and is an American citizen. At all relevant times to this action, he resided in the State of Florida.

9. Defendant GENERAL ELECTRIC COMPANY ("GE") is a multi-national company with its Oil & Gas Digital Division headquartered in San Ramon, California. It is a corporation organized under the laws of the state of Delaware.

10. At the end of October 2016, GE announced the creation of a publicly-traded entity controlled by GE valued at about $30 billion that would combine its Oil & Gas Digital Division with Baker Hughes. Shareholders approved the merger agreement at the end of June 2017 and the deal was completed, with Baker Hughes becoming a GE company the next month in July. The GE Oil & Gas Division was and is located in San Ramon, California.

11. Defendant BAKER HUGHES, A GENERAL ELECTRIC COMPANY ("BHGE"), is a multi-national business that serves as a leading supplier of oilfield services, products, technology and systems to the worldwide oil and natural gas industry. It is a corporation organized under the laws of the state of Texas. BHGE's 32,000 employees work in more than 80 countries helping customers find, evaluate, drill, produce, transport and process hydrocarbon resources. In 2017 GE Oil & Gas Division merged with Baker Hughes, Inc.

to become Defendant BHGE. The combined Oil & Gas Digital Division was located in San Ramon, California.

12. Defendant Lorenzo Simonelli ("SIMONELLI"), at all times relevant to this action, was and is the Chairman, President & CEO of BHGE. Upon information and belief, SIMONELLI approved, ratified and/or assisted in the wrongful acts described in the Complaint. He is a Caucasian Male of Italian ethnicity and of Italian nationality.

13. Defendant Matisse Heilmann ("HEILMANN"), at all time relevant to this action, was and is the Chief Executive Officer for the Oil & Gas Digital Division, Chief Digital Officer and a corporate officer of BHGE. Upon information and belief, HEILMANN approved, ratified and/or assisted in the wrongful acts described in the Complaint. He is of German ethnicity and born in Germany.

14. Defendant Harry Elsinga ("ELSINGA"), at all time relevant to this action, was and is the Chief Human Resources Officer for the Oil & Gas Digital Division and a corporate officer of BHGE. He was a direct report to Defendant SIMONELLI and a peer of Defendant HEILMANN. Upon information and belief, ELSINGA approved, ratified and/or assisted in the wrongful acts described in the Complaint. He is of Dutch ethnicity, born in Holland and holds a visa to work in the United States.

## IV.  FACTUAL ALLEGATIONS

### A.  Plaintiff Jones' Collaborative Educational, Athletic, Family and Work Background Prior to His Employment with General Electric.

15. Ernest Jones has a long and personal history emphasizing collaborative work. Born in Baltimore, Maryland, Mr. Jones was raised in the city and attended Baltimore City public schools – a place where he came to understand that success comes only when you work

COMPLAINT - 5

together. He received a great education and developed skills to achieve early successes in the sciences at the Baltimore Polytechnic Institute. His appreciation for his parents' support and quality education bolstered his desire to help other students excel in science, technology and mathematics programs. In college, he coupled his expertise with creativity and invocation to assist his classmates to win the B.F. Goodrich Innovators Award recognizing advancements in science.

16. Mr. Jones obtained a Mechanical Engineering Degree from the University of Delaware and excelled as an athletic teammate in college baseball as a Fighting Blue Hen. Along the way, he made sure to give back to his community through assisting young men and women in STEM-related work in college and early jobs at DuPont and IBM. He also participated on several public school boards, notably the Board of Directors for Seminole County Public Schools.

17. Mr. Jones mentored young engineers and sales professionals at DuPont and IBM and chaired the African American Affinity organization at Oracle. He helped to establish both scholarship programs at local levels and privately supported sponsorship programs for African Americans in STEM.

18. Never far from the church where his father and mother worshiped, he has always been committed to teaching young engineers and engaged the African American community in closing the digital divide. To that end, he invested in a potential business with a partner to livestream church services at low costs with wider distribution and greater demographics to literally, get the "Word" out. (A start-up that his former employer would punish him for supporting.)

COMPLAINT - 6

19. Mr. Jones' career has continued to unfold in a series of high-profile positions with corporate 500 companies. In the last 25 years, he has held jobs of increasing responsibility and sales successes. Through his work at IBM, Oracle and other positions, Mr. Jones established a pattern of meeting high target goals and other performance measures. He was able to identify and cultivate talented sales employees – employees who would follow him as he moved on.

20. In 2016, Mr. Jones was Group Vice President, North American Cloud Solutions, at Oracle. He led a sales team focused upon Cloud offerings and market penetration. Located in the San Francisco Bay area, he led a 350-person sales staff and service team in the digital space. He earned a corporate executive benefits package that included a competitive salary and participation in ORACLE's equity plan.

21. Prior to working on the cloud platforms, he also managed Strategic Business Units at Oracle. He came to Oracle from IBM, another Fortune 500 corporation, where he managed different sales teams in various software technology centers throughout IBM.

### B. The Hiring of Ernest Jones.

22. Mr. Jones is a well-regarded corporate executive, industry leader, mentor, team-leader and speaker with deep and substantive work experience and a proven ability to perform and motivate his team. GE was impressed with Mr. Jones, so it recruited and hired him to build its digital business, correct mistakes in current sales operations, and engineer the efficient transformation of the O&G digital platform.

23. The GE courtship resulted in an attractive employment package that induced Mr. Jones to leave his ORACLE position in November 2016. He accepted the position of Chief Sales Officer – O&G Digital for GE Oil & Gas. His recruitment package included: a signing

COMPLAINT - 7

bonus; base salary; annual executive incentive bonuses, stock swap; stock options; and other related benefits, such as a corporate vehicle, travel and expense accounts, executive life insurance, and participation in the retirement plan.

### C. GE's Commissions and Bonus Plans.

24. Mr. Jones, as the Chief Sales Officer, was responsible for GE's sales operations in five regions around the world - the Middle East, Africa & India, Europe and Russia, Asia Pacific, and Americas (North and South). Mr. Jones' sales employees received compensation in two ways: (a) salary and/or (b) incentive packages ("commissions"). Sales representatives received a commission on the GE products they sold. Each employee entered into a Sales Incentive Compensation Plan ("SIP") with GE. Mr. Jones helped develop the SIP plans containing target goals and commission rates. Employees were paid according to the SIP schedules after meeting sales targets. Senior GE Manager Defendant HEILMANN specifically approved the SIP plans for 2017.

25. Employee target goals were outlined at the beginning of each year, agreed to and signed, setting out the elements for payment due to each employee: Base Compensation Rate, Qualifying Sales, Deal Credits, Quotas and On-target Payments. Separate employee agreements set out the terms and conditions of payments, exceptions and definitions.

26. GE, in the SIP contracts, established the timing for payment of sales commissions as the second pay period within the second quarter or within the next quarter following the closure and booking of the sales agreement. These SIP contracts constituted the deal between GE and its sales representative employees.

27. Mr. Jones proved to be a valuable sales manager. His sales efforts produced significant profits for the newly GE-merged company, BHGE. Most notably, he netted the

COMPLAINT - 8

acquisition of a key $307M deal with Rosneft, driven by his 31-member European/Russia sales team, and a $3B Memorandum of Understanding with Aramco in the Kingdom of Saudi Arabia.

28. GE's Digital Division widely publicized the Rosneft deal inside and outside the company because it was the *largest digital deal ever closed* in that Division. Widely acknowledging its importance to the bottom line, BHGE CEO's SIMONELLI cooed about the Rosneft sale's closing at the Barclay's 2017 CEO Energy-Power Conference in New York City. Mr. Jones' team circulated a company-wide video discussing the Rosneft sale and interviewing staff who pondered how their commissions would be spent and how the congratulatory celebrations would be enjoyed.

29. The deal closed during the third quarter on July 27, 2017. As a result of that deal, Mr. Jones, almost immediately, met, and exceeded his 2017 revenue target projections. Plaintiff's 2017 O&G Digital Division quota for was $300M; he exceeded that quota by 130%. His sales team exceeded its full year target goals.

30. Commissions were to be paid in the second payroll period of the second month after quarter close of a "qualifying sale." Plaintiff's team calculated the commissions earned and owing under their respective SIPs in advance of an October 11, 2017 conference call with HEILMANN. The commissions for the 31-member Rosneft Deal team totaled approximately $7.2M.

### D. The Commission Avoidance Scheme.

31. BHGE balked at paying the commissions due to their Rosneft Deal team. On October 11, 2017, Mr. Jones participated in a telephone conference with Defendant HEILMANN and other operations staff to discuss sales commissions and payment. In that conversation,

Mr. Jones presented the commission schedule to upper management, including HEILMANN, who expressed resistance to paying the wages due. While tasking Defendant ELSINGA to obtain Defendant SIMONELLI's approval, HEILMANN proposed options to make either underpayments or no-payments to the deal team.

32. HEILMANN, a German national, never felt comfortable working with Mr. Jones, an African American. HEILMANN's trusted "team players" were all Caucasian and/or European nationals. Once Mr. Jones complained, the White European Managers closed ranks and shut him down. They followed through on their plan to avoid paying the commissions due (the "Commission Avoidance Scheme").

33. Essentially, the Commission Avoidance Scheme violated GE's internal policy and state law. The discussion to curb commission occurred after the Rosneft deal had closed and after the commissions were due to be paid. Mr. Jones argued that the Company needed to weigh the legal, goodwill and reputational impact of reducing or eliminating commissions after they were earned. Withholding commission payments would be a breach of contract that violated BHGE's legal obligations and the law, but his objections were ignored.

34. HEILMANN made clear that he was not persuaded. Nonetheless, he refused to take sole responsibility for the decision. He made clear in the October 11, 2017 conference call that any recommendations and decisions needed to be approved by ELSINGA as well.

35. Mr. Jones immediately scheduled a one-on-one discussion with ELSINGA. They spoke two days later, on October 13, 2017. In this call, Mr. Jones repeated to ELSINGA the arguments he had previously made to HEILMANN. ELSINGA explained to Mr. Jones that he agreed that the employees needed to be compensated fairly, but he made quite

clear that he had no intent of honoring the $7.2M due to the Rosneft Deal sales team. ELSINGA offered other schemes to reduce payments, such as paying the sales team members 10% of full commissions or offering stock-in-kind as an alternative form of payment. ELSINGA confirmed that he intended to confer with SIMONELLI and ultimately gain his approval.

36. HEILMANN, ELSINGA and others began retaliating against Mr. Jones almost immediately after the October 11 &13 calls by ginning up pretextual reasons for disciplining him and creating a hostile work environment. On information and belief, the "others" involved included SIMONELLI.

37. Specifically, both HEILMANN and ELSINGA refused to respond to Mr. Jones's text messages, emails, voicemails, or phone calls. Plaintiff was also excluded from all of HEILMANN's future meetings related to the Rosneft deal commission payments. Further, Plaintiff was: (1) excluded from workplace activities; (2) denied attendance at previously-scheduled meetings and conferences; (3) precluded from contacting and meeting SIMONELLI at scheduled meetings and conferences; (4) harassed by GE's managers; (5) subjected to fabricated and swiftly crafted performance-related adverse actions; (6) subjected to having his travel plans cancelled; (5) ignored and excluded from business communications and information needed to perform his job duties (i.e., unanswered emails or returned phone calls); and (6) ultimately terminated from his employment. HEILMANN replaced Mr. Jones in Rosneft deal meetings with Mr. Jones' subordinate, Elena Torres, Vice President, Global Sales Operation, BHGE.

38. Specifically, BHGE opened an investigation of Mr. Jones' travel and expense accounting. Then BHGE investigated the propriety of Mr. Jones' funding of a start-up. In addition,

COMPLAINT - 11

claims of unprofessional conduct were alleged against him. BHGE moved quickly and piled on; it denied Mr. Jones any meaningful chance to understand what was happening and defend himself.

39. BHGE summarily fired Mr. Jones on November 7, 2017 – within three weeks of his raising his objections and complaints seeking to protect commission payments for the Rosneft team. The termination letter was signed by Defendant HEILMANN. Plaintiff was immediately replaced by a male Caucasian European national.

40. Upon information and belief, on or about January 2018, BHGE issued the 31- member Rosneft Deal team a one-page notice stating the commission payment. This was at least four months after the end of the quarter in which commission payments were due to be paid pursuant to GE's O&G Digital 2017 Sales Incentive Plan (SIP) Terms and Conditions § 15 (Timing of Payments) applicable to BHGE employees.

41. This one-page notice acknowledged that the Rosneft deal had closed in the 3rd Quarter of 2017 and stated that the January compensation statement would constitute the only commission payment the members of the team would collect. Interestingly, BHGE now described the commission as a "bonus." BHGE provided no explanation or statement to the employee to show <u>how</u> the payment calculation was made and/or <u>why</u> the payment amount was substantially lower than that promised by each employee's SIP statements.

42. Upon information and belief, each employee was required to sign a waiver agreeing that the "bonus" constituted the sum total of the commissions/bonuses/wages due for the deal in 2017.

### E. The SOLUTIONS Chimera and Continuing Retaliation.

COMPLAINT - 12

43. Defendant HEILMANN, in Germany, waited until 7:30am EST on the morning of November 7, 2017 to call the Plaintiff and terminate his employment. In the brief conversation that Mr. Jones subsequently had with Human Resources, BHGE explained that Mr. Jones could use GE's internal multi-level ADR process ("SOLUTIONS") to challenge his wrongful termination.

44. Despite receiving specific instructions from BHGE that he could use the SOLUTIONS dispute resolution process, BHGE repeatedly and effectively evaded providing Mr. Jones access to the SOLUTIONS process.

45. Indeed, as of this filing, notwithstanding the repeated efforts by Mr. Jones to utilize SOLUTIONS over the past year, BHGE has aggressively and stalwartly refused to allow the process to advance. In some cases, BHGE imply ignored Mr. Jones. BHGE failed to timely respond to his complaint, in violation of the SOLUTIONS timelines and procedures, to return emails, and recently BHGE objected to his application to obtain an arbitrator to hear his claims.

46. Furthermore, BHGE took steps to make sure that Mr. Jones could not obtain further employment. More than six months after his separation, BHGE supplied its third-party employment verification services EVI with employment information concerning Mr. Jones that was both inaccurate and incorrect, effectively making it impossible for any prospective employer to verify his employment. As a result, Mr. Jones was denied prospective job offers because he could not verify his BHGE employment.

47. The retaliation against Mr. Jones continued throughout the year following his separation. He learned that confidential personnel matters pertaining to him were freely discussed by BHGE officials and disseminated in the business community.

COMPLAINT - 13

48. BHGE actively and/or recklessly prevented Mr. Jones from pursuing new employment, pursing a likelihood in his chosen careers and irreparably damaged the professional career he took 20 years to build. At the same time, BHGE prevented him for challenging his separation and BHGE's conduct in a forum made available to BHGE employees.

49. Similarly, BHGE refused to provide Mr. Jones a copy of his personnel file (in violation of California law).

## FIRST CLAIM FOR RELIEF

### Breach of Contract: Terms Implied in Fact

50. PLAINTIFF incorporates by reference allegations 1 to 49 stated above.

51. Corporate Defendants' conduct breaches the terms and conditions of The Spirit and the Letter, a GE policy document incorporated implicitly into the employment agreement between PLAINTIFF and GE/BHGE. Specific terms breached include those encouraging and rewarding employees for bringing issues of concern to superiors and threatening discipline where one fails to do so.

## SECOND CLAIM FOR RELIEF

### Breach of Contract: Implied Covenant of Good Faith and Fair Dealing

52. PLAINTIFF incorporates by reference allegations 1 to 51 stated above.

53. Corporate Defendants' conduct breaches the implied covenant of good faith and fair dealing implied by fact and law into the employment agreement between PLAINTIFF and GE/BHGE. Specific covenants breached include those encouraging and rewarding employees for bringing issues of concern to superiors and threatening discipline where one fails to do so.

## THIRD CLAIM FOR RELIEF

### Employment Discrimination under Title VII, US Civil Rights Act: Race

54. PLAINTIFF incorporates by reference allegations 1 to 53 stated above.

55. Corporate Defendants' conduct constitutes discriminatory treatment on the basis of PLAINTIFF's race as an African American. It reveals differential treatment on the basis of his race which was a substantial factor in his termination.

### FOURTH CLAIM FOR RELIEF

### Employment Discrimination under Title VII, US Civil Rights Act: National Origin

56. PLAINTIFF incorporates by reference allegations 1 to 55 stated above.

57. Corporate Defendants' conduct constitutes discriminatory treatment on the basis of Plaintiff's national origin as an African American. It reveals differential treatment on the basis of his national origin which is a substantial factor in his termination.

### FIFTH CLAIM FOR RELIEF

### Termination for Whistleblowing (Cal. Labor Code §§ 98.6, 98.7; 1102.5)

58. PLAINTIFF incorporates by reference allegations 1 to 57 stated above.

59. Corporate Defendants' conduct constitutes retaliation for raising the possibility that BHGE was acting unjustly or unfairly vis-à-vis the wages/commissions/salary due to his direct reports, fellow BHGE employees.

### SIXTH CLAIM FOR RELIEF

### Wrongful Discharge in Violation of Public Policy

60. PLAINTIFF incorporates by reference allegations 1 to 59 stated above.

61. Corporate Defendants' conduct constitutes retaliation for raising the possibility that BHGE was acting unjustly or unfairly vis-à-vis the wages/commissions/salary due to his direct reports, fellow BHGE employees.

COMPLAINT - 15

## SEVENTH CLAIM FOR RELIEF

### Restitution; Conversion; Breach of Fiduciary Duty; Bailment

62. PLAINTIFF incorporates by reference allegations 1 to 61 stated above.

63. Corporate Defendants' conduct constitutes misappropriation and/or improper retention of financial benefits belonging to PLAINTIFF. In the case of Oracle stock options, these assets were entrusted to BHGE for its prudent management as part of its recruitment of PLAINTIFF for employment.

## EIGHTH CLAIM FOR RELIEF

### Intentional/Negligent Infliction of Emotional Distress

64. Plaintiff incorporates by reference allegations 1 to 63 stated above.

65. Corporate Defendants' conduct constitutes intentional and/or negligent infliction of emotional distress, which distress was either known or could easily have been known to be a result of Defendants' treatment of PLAINTIFF following the October 11 and 13 meetings and certainly a result of his termination and Defendant's continued thwarting of PLAINTIFF's ability to get another job. As a result, PLAINTIFF has suffered humiliation, embarrassment, emotional and mental anguish and damage to PLAINTIFF's professional reputation.

## NINTH CLAIM FOR RELIEF

### Defamation

66. Plaintiff incorporates by reference allegations 1 to 65 stated above.

67. Corporate Defendants' conduct constitutes defamation, in that the unfounded allegations of unprofessional conduct have been disseminated more broadly than necessary for the imposition of discipline. More, as the imposition of discipline itself was trumped up by

HEILMANN specifically, defamation exists not just against BHGE for the improper dissemination but against HEILMANN personally even for a limited dissemination in the context of internal discipline. As a result, PLAINTIFF has suffered humiliation, embarrassment, emotional and mental anguish and damage to PLAINTIFF's professional reputation.

## TENTH CLAIM FOR RELIEF

### Interference with Prospective Economic Advantage

68. PLAINTIFF incorporates by reference allegations 1 to 67 stated above.

69. Corporate Defendants' continued thwarting of Plaintiff's ability to get another job constitutes interference with prospective economic advantage. On information and belief, Defendant HEILMANN is the individual who provided inaccurate and incorrect information regarding PLAINTIFF's position to BHGE's third party employment service, and likewise HEILMANN did this specifically to retaliate against PLAINTIFF while knowing that it was improper and illegal to do so. Accordingly, the claim for interference with prospective economic advantage exists not just against BHGE but against HEILMANN personally. As a result of the conduct alleged herein, PLAINTIFF has suffered humiliation, embarrassment, emotional and mental anguish and damage to PLAINTIFF's professional reputation.

## ELEVENTH CLAIM FOR RELIEF

### Retaliation in Violation of CRA, 42 U.S.C. § 1981, *et seq.*

70. PLAINTIFF incorporates by reference allegations 1 to 69 stated above.

71. Corporate Defendants' conduct constitutes retaliation for engaging in protected activity, namely his submission of a claim of discrimination based upon race and national origin.

COMPLAINT - 17

Once Mr. Jones filed a claim of discrimination against GE and BHGE in December 2017, the companies were on notice that he had a pending claim of wrongful termination on the basis alleged therein. Nonetheless, and specifically on account of PLAINTIFF's submission of his claim, BHGE refused to accurately and properly verify his employment data such that prospective employers could obtain that information. Upon information and belief, BHGE and its officials, specifically including HEILMANN, actively "black-balled" Mr. Jones to curb and damage his professional career.

72. In the event that the acts alleged in this claim for relief are not considered as a continuing violation of the acts encompassed in the submission previously made by PLAINTIFF to the EEOC, PLAINTIFF predicates this claim for relief upon the (Amended) Notice to Sue issued November 20, 2018 by California's DFEH.

## TWELFTH CLAIM FOR RELIEF

**PAGA, Cal. Lab. Code § 2699 *et seq*.**

73. PLAINTIFF incorporates by reference allegations 1 to 72 stated above.

74. PLAINTIFF has articulated a claim on behalf of his 31 former employees (whether still employed or not) for the wages/commissions due them by the Corporate Defendants under Cal. Labor Code §§ 200, 201(a), 204(a), 221; *see also* § 203. See also DLSE Opinion Letter 2002.12.09-02 (Dec. 9, 2002).

75. PLAINTIFF recognizes the need to provide the State of California with the chance to take action on behalf of these employees and that any civil action undertaken by PLAINTIFF is predicated upon the State's failure to act. PLAINTIFF has submitted his claim to the State on November 20, 2018.

## THIRTEENTH CLAIM FOR RELIEF

COMPLAINT - 18

**RICO, 18 U.S.C. § 1961 *et seq*.**

76. PLAINTIFF incorporates by reference allegations 1 to 75 stated above.

77. Individual Defendants' conduct constitutes the conduct of an enterprise through a pattern of racketeering activity. The enterprise is the association in fact comprised of HEILMANN, ELSINGA, and SIMONELLI within the aegis of otherwise legitimate entities BHGE, GE and GE Digital Division. The pattern of racketeering consists of more than two events of email correspondence and extortion through which 31 employees were forced to release their legitimate claims to compensation if they wished to remain employed by BHGE, a violation of the mail and wire fraud statutes [18 U.S.C. §§ 1341 and 1343] and extortion [18 U.S.C. § 1953].

### PRAYER FOR RELIEF

A. PLAINTIFF seeks the following damages and other equitable relief, based upon the claims for relief cited above. These damages are itemized as follows:

B. Compensatory damages, including, but not limited to:

  1. Annual Executive Incentive Payment earned;
  2. Current value of equity including "RSU" equity, equity from Oracle and stock options;
  3. Front pay;
  4. Damages to employment reputation;
  5. Back pay;
  6. Lost earnings and future lost salary related to DEFENDANTS' willful failure to verify employment;

C. Interest;

COMPLAINT - 19

D. Reasonable attorneys' fees, and costs of the suit herein;

E. Appropriate injunctive and declaratory relief;

F. Punitive and/or exemplary damages pursuant to any appropriate counts above;

G. Statutory penalties under PAGA;

H. Nominal damages if or where the precise amount of damages cannot be calculated; and

I. For such other relief as the Court may deem just and proper.

Dated:  November 20, 2018

Respectfully Submitted,


_____/s_____ _____
David M. Rosenberg-Wohl
**HERSHENSON ROSENBERG-WOHL,**
**A PROFESSIONAL CORPORATION**


_____/s_____
Lisa A. Bell, D.C. Bar No. 424685
**PCT Law Group, PLLC**
1155 F Street, N.W., 10th Fl.
Washington, D.C. 20004
Telephone: (202) 798-5775
lbell@pctlg.com
(*Pro Hac Vice* forthcoming)

COMPLAINT - 20